Okay, the first case that we're going to hear this morning is Electric Clouds v. FDA and we'll hear from Councilor Navar for the petitioners. Thank you, Your Honors. If you're ready, I'll go ahead and begin. Okay, so Jared Navar, four petitioners, Cloud9 and Electric Cloud, both of New Mexico, very small vapor e-liquid manufacturers for open tank systems. There have been a lot of arguments and decisions from other courts of appeals in very similar cases and I know you're aware of that. We've discussed it in the brief. I want to get right to the point of our two main arguments for why the FDA's denials here are arbitrary and capricious and illegal. Well, Council, as you do go through that, having read those other cases, I'd like for you to tell me just exactly how this case differs because all the other cases seem to be going, even the 11th Circuit goes off on a different way that they reversed. So, and this is a difficult case for me, so I really appreciate you going through and explaining why your case is different from those other cases. Yes, Your Honor. Thank you. And, well, there has, so there is obviously a circuit split. I'll talk extensively about the 11th Circuit and Bitty Vapor, also about the 5th Circuit's two decisions. There have been two panels of the 5th Circuit that have ruled for petitioners in similar cases. Well, see, I don't see the 11th Circuit being a split. I see it distinguishable as to how they ruled, which was a little different from all of our cases, so. Well, OK, so I'll go right to the 11th Circuit, which ruled for petitioners on the second part of my argument, which is the failure to review the marketing plan. And if the court, if you read that opinion, there's three pages of the Federal Reporter that the 11th Circuit used to describe extensively why the FDA, not only was it wrong for them to refuse to read the petitioner's marketing plans, which is the same issue we have here, the footnote in the denial orders here says the FDA, just for efficiency's sake, was refusing to even read the marketing plans. The 11th Circuit said that was error, and it was not harmless error because, and this is important, and it goes to my first point also, that the 11th Circuit said in reviewing the marketing plans again, the FDA, or for the first time, the FDA must make a distinction, they must recognize the material distinctions in device types, that the open tank systems are materially distinguishable, in the FDA's own words from the 2020 guidance, from the appeal to youth, and the FDA has tried to muddy the waters on this argument here, and this really gets to the central issue in this case, on all the issues, because all throughout the FDA has attempted to ignore this distinction, which I think is critical, because the FDA has basically said, because youth, you know, in these surveys have shown to have moved from one device type to another, they've tried to extrapolate that as if all device types are equally appealable, equally appeal to youth, but what the FDA said in its 2020 guidance, which we've highlighted in the briefs, is that there are three specific characteristics of these products that specifically appeal to youth, that they're discreet, they're convenient, they're easy to be used, and easy to conceal, and they talk extensively, this is in the reply brief, page 20 and 21, I think I have a long quotation from the FDA's 2020 guidance where they go through explaining, not that all device types equally apply to youth, but that youth are drawn to the ones that are, you know, they look like a flash drive sometimes, they're discreet, and they can easily slide them into their pockets when they're at school, or into their backpacks, and particularly relevant here, because all my clients' products are juices made for open tank systems, this is a large vaporizer and battery sort of contraption that has a reservoir, and you buy these little bottles of liquid, and you squirt it into the reservoir. One of the things the FDA said in that 2020 guidance was that the ease of use is specifically attractive to youth, and they said that because the products that the youth like come pre-filled with the liquid, they're talking about disposables and cartridge-based or pod-based products. The Magellan case from the Second Circuit is a case discussing cartridge-based products, those are distinguishable from my client's products, and that's what the Eleventh Circuit said, they said, the FDA's refusal to review the marketing plans was not just error, it was error, and it was not harmless, because on remand, the FDA must take into account this material distinction. In other words... Well, Bitty Vapor did something far more significant, and I think put far more reliance on the fact that two of the vaping companies in that case had proposed marketing programs that were far different than the types of marketing programs that had been addressed in the 2020 guidance in terms of the X-Trace technology, the counterfeit technology, and I thought that the majority in Bitty Vapor had specifically relied on the fact that there were marketing programs that had not been envisioned in the 2020 guidance, nor in the 2021 final rule. Well, they did, and they cited, one of them was what's called a TraceVerify program that won, I think, Johnny Copper in that case, that was my case also, it was my client, and I argued that case, but also, they did cite that as an example, but they also said, and this is quoted at page 18 and 19 of our reply, this is Bitty Vapor quoting from FDA's 2020 guidance. At what page in Bitty Vapor are you quoting from? Well, I'm quoting from my reply on page 18 going on to 19, where I quoted Bitty Vapor quoting the 2020 guidance, and if we read that, they specifically point out, the FDA itself said that these products that they're considering, Bitty Vapor said that the FDA had never said in the 2020 enforcement guidance that these marketing plans that they had reviewed before were per se insufficient for open tank systems, and they said, so even if it was something that was, you know, viewed as not sufficient to protect youth from cartridges or disposables, they didn't per se say that with respect to open tanks, and that's what the Fifth Circuit has also said in the recent RJ Reynolds Vapor case. So, what about in the 21 final rule, when FDA said, and I think at the closing, that if the flavored e-liquid doesn't satisfy the scientific standard, no marketing program will be able to salvage it? Well, this comes back to what I've called the FDA's circular reasoning in our briefing, because the FDA has, our contention is they've artificially increased the standard of evidence required here for open tank products because they ignore this distinction, and that applies to the scientific standard applicable as well. In other words, they've said, for example, the reason that they apply a lower standard of evidence for tobacco flavored products is because they say they're less appealing to youth. By that same rationale, open tank e-liquids have never been determined by FDA, much less my client's products, to be, you know, anywhere near appealing to youth. And so, by the same rationale, if that's the case, the FDA can't just, what they try to do is lump open tank systems in with disposables and cartridge-based or pod-based systems. Because youth move from one sleek, easy-to-conceal, pre-filled type of product to another, they try to say, well, the appeal of flavor extends across device types, and that is an obfuscation. That is ignoring a material aspect of the problem, which the FDA... But I don't understand that. So, if I assume you're talking about the 2019 guidance, if the FDA says that, that's the And as I understand it, you're acknowledging that the FDA said that the flavored e-liquid is attractive to youth regardless of device type, and you're saying, well, they ignored this open tank system. How are the three of us to say, well, FDA, you know, we know better than you do about whether or not open tank systems are attractive to youth? That's what they said. Well, okay, so let me go right to that point. I'm not asking the court to do that, and you don't have to do that. All I'm asking is what the law requires, which is that because the FDA has already itself said that this distinction is important and material, they can't now ignore it without explaining it. And what I'm saying is that they haven't even tried to explain it. They just try to obfuscate it by saying youth migrated from disposables to cartridges, and therefore we can essentially ban open tank e-liquids as well, even though they still don't have the characteristics of products that appeal to youth, which the FDA itself has recognized in the 2020 enforcement guidance. And they've never said that, you know, the characteristic that is pre-filled and discrete and easy to hide and use in school, they've never said that that's no longer applicable. Well, we saw that in Amicus's brief. Well, but the FDA has not ever said that. They've just, I've argued this case and the same issue in multiple appeals and briefed it. The FDA tries to get away from that distinction here for the first time in their response brief here was the first time they've ever made the argument that open tank e-liquids can be used in cartridge-based systems to replace a cartridge-based pot. And that is nowhere in the record. And as I, we came out very vigorously against that contention. It's not in the record. It's something that my clients would specifically dispute if we needed to supplement the record. I'm not aware of that ever happening. And I think I discussed the study the FDA relied on, which was one study which predated their own distinction in 2020 by five or six years. And if you read the study, I've cited it in the reply, it doesn't even, they didn't, the question that the FDA is sort of relying on there doesn't even distinguish between open tank e-liquids and cartridges, replaceable cartridges. Counsel, since you've argued this several times, tell me then for this court to write an understandable order, if we're to reverse, you tell me the language that needs to be there so that not only the FDA, but another court understand where they went wrong. How would you write such an order reversing? Okay. Well, and with clearly, not okay with this or that, because that's the problem we've got is to write something that's clearly understandable, but does not impede the FDA rule, but says you were arbitrary and capricious in doing this. Okay. And in response to that question, I'll try to answer also my, or get to my first point, which is the change in the substantive standard retroactively. The order could simply say, we're not, and this is an important point, we're not asking, we're not challenging the traditional and very capacious discretion that a federal agency has to implement a statute like this one that leaves a lot of flexibility. But the one protection we have, you know, regulated entity has is the requirement of fair notice of what the standard is before you go through the burden of submitting the application. So on this record, you're saying number one, you are totally without fair notice. Is that part of the language that you would have us say? Absolutely. There's a lack of fair notice because the FDA changed, they took what was a discretionary decision as to which comparative products to use. And they narrowed it down retroactively to say, if you don't compare your products to tobacco flavored e-liquids, then you don't even proceed further in scientific review. This court doesn't have to tell the FDA they messed up on the science. The simple problem is that they took what was one possible comparative product and they made it the only comparison that you could make to warrant any further scientific review. And counsel, just assume we do exactly what you asked and wrote it that way. And it's remanded. And they issued the same, so you have a chance to make a new presentation with notice. How would your presentation differ? Well, that would entirely depend on what the FDA's rationale would be. What if they adopted the very thing that they did that you said you had inadequate notice of? Okay, we reverse, we send it back, there's inadequate notice. They do the same thing and you have notice now. How would your presentation differ? Well, so I guess the question I would have is what I think would be required now, unless the FDA allows us to submit a new application to address or even amend the application, which should be allowed. If that's what the consequence of your lack of notice argument is that your application would be different if you had notice, what would you put in a new application that you didn't put in this one? Then the new application would, if the same standard applies that they've applied in these denial orders, the new application or the supplements would simply compare the products to tobacco flavored e-liquids. The problem was that our applications compared the products to other flavored products, essentially. And frankly, that's what everybody did. And that's why the FDA... At least one circuit thought that everybody had no, you know, of course you would compare it to that because you have the tobacco flavor. Well, and I would like to address that. That's an important point. And I want to address that. I've got two responses. That's, I think you're referring to the prohibition case. DC Circuit was the first court that said that. I disagree with that analysis because, I mean, number one, nobody or virtually nobody in the industry actually did that. And that's because if you look at the FDA's guidance, the 2019 guidance, pages 13 and 14 is a PDF. This starts at excerpts of the record, page 112. But within the guidance, it's page 13 or 14. They describe the types of comparative products that you're supposed to use and that the instructions to the industry were to use, were to compare your products at issue to products that the consumer is likely to view as interchangeable when it comes to e-liquids. Nobody compared... Adult consumers are buying flavored products, and not really tobacco and menthol flavors. Those are very small, that section of the flavor offering. Nobody in the industry thought that that was the only comparison to be done or that the FDA would think was relevant. And that's reflected in the list of the products at issue. In substance, in fact, what you're telling me is that you just disagree, and most other applicants disagree with that analysis and that report. Well, and the people in the industry who were told to choose a comparator that the consumers that they know would likely view as interchangeable, they had discretion then to choose a comparative product. And the court is not in a position to say... It seems hard for me to understand how the Court of Appeals can say it was an obvious choice and the only potential choice when nobody in the industry actually did that, including R.J. Reynolds, which is what the Fifth Circuit observed in their recent opinion. Thank you. Can I just ask you one quick question? I know we're out of time. Nobody has mentioned the qualification in the 2019 guidance that starts with a big block that says it does not establish any rights for any person and is not binding on FDA or the public. Does that qualifying language affect the degree to which your clients could have reasonably relied on the terms of the guidance? Well, no, that doesn't take away our argument. And the FDA hasn't... I don't think they've ever made that argument. And there's a section in the brief where we list several cases discussing this fair standard, and it comes from... It's applicable even when the FDA says things in an informal capacity. There's press releases. There's cases discussing that in the briefs. All right. Thank you very much. We'll hear from the respondent. Thank you, Your Honors. Thank you. Good morning, Your Honors. May it please the Court. I'm Josh Koppel from the United States. FDA denied petitioners' applications to market e-cigarette products in flavors like Berry Cereal, Caramel Apple, and Grandma's Cookie because petitioners failed to demonstrate that the known and substantial risk that products like those present to youth is outweighed by a potential benefit to existing smokers. Each of petitioners' arguments has been presented to and rejected by multiple courts of appeals, and the overwhelming consensus from the second, third, fourth, sixth, seventh, ninth, and DC circuits is that FDA properly evaluated the applications of manufacturers of flavored e-cigarette products. Are you saying, then, that the Eleventh Circuit does agree with opposing counsel's argument? The Eleventh Circuit went a different way on a narrow basis. As Your Honor pointed out, the Eleventh Circuit thought that in the manufacturers' marketing plans, the manufacturers in that case, that they had presented a novel youth access restriction measure that FDA had not previously considered. And on that basis, the Eleventh Circuit said that the FDA needed to take a fresh look. Okay. So is there any circuit that has gone directly in accordance with opposing counsel's argument? No. Opposing counsel relies on some Fifth Circuit stay orders. The Fifth Circuit procedural route here is a bit complicated. A panel issued a stay of the FDA's denial order. A merits panel then affirmed or denied the petitioner's petition for review, affirming the FDA's denial order. The Fifth Circuit currently has that order under review on bunk. So the Fifth Circuit has not yet issued a decision on the merits of this issue. Okay. Judge Murphy's question really rings true in regards to the question. Let's assume, just for argument, that we reverse. Then how, as part of the FDA, would his petition differ from what he's already argued? The manufacturers would need to present evidence that their products, that their flavored e-cigarette products, offer a substantially greater benefit to existing smokers compared to tobacco flavored products. That is, the petitioner's products are more likely to lead existing smokers to reduce or quit their smoking. Is there only one way to do that? Or is there different ways that you could choose to do that? You know, FDA has said that that comparative efficacy standard could be met through a variety of different evidence, different types of studies. So it could be a longitudinal cohort study, randomized controlled trial, or it could be other evidence that is sufficiently reliable and robust to show that comparative efficacy. Now, this case was stayed for over 12 months. And during all that time, petitioners had an opportunity. They could have submitted a new application. They could have been conducting those studies. They could have submitted a new application following the denial order, seeking permission to market these same tobacco products. The fact that petitioners have not done so, I think, really indicates that there is no such evidence in there that their products do present that comparative benefit compared to tobacco flavored products. Petitioners put a lot of emphasis on the fact that their products are an e-liquid and not a cartridge-based device or a disposable device. First of all, numerous other courts have considered similar applications by manufacturers that create e-liquids. The Third Circuit, Fourth Circuit, Seventh, Ninth, and D.C. Circuit cases, all of those involved e-liquids. Furthermore, even though it is true that currently, or in the past, that refillable devices, tank devices, open system devices have been less popular among youth, they are still the product of choice for over half a million youth. And this is in the study at ER 97. So petitioners' products present a substantial risk to youth even if open system devices are less popular. Furthermore, FDA determined that the market for these different device types is fluid and that youth will go to whichever device type they can get with the flavors that they are seeking. So FDA determined that what drives demand in this market is the flavors. And FDA made this determination after its enforcement policy in 2020 when they started going after the cartridge-based devices. And youth simply migrated to the disposable device. Prior to that enforcement action, the disposable devices made up, I think, 2.4% of the youth market. And after FDA started to take the cartridge-based devices off the market, use of disposable devices jumped to something like 29%. So FDA saw that, again, the market among these device types really is fluid. How do you respond to your opposing counsel's argument that they're not talking about disposable cartridges, they're talking about these open tank systems, and that it's illogical, in his view, for the FDA to infer that youth will migrate to all device types when there has been no empirical indication that they would migrate to open tank systems? So first of all, again, even though open tanks may be relatively less popular, again, they still are the device of choice for more than half a million youth. So that shows that these really are a device that youth are willing to use. Furthermore, the open system devices are not the large tank devices the petitioner described. If you look in the amicus brief at page 11, they have pictures of open system devices. These are small, these are sleek, these are easily concealable. Are those pictures in the record? And has there been any indication that the FDA has relied on those pictures or any like pictures? Not those pictures, but FDA's knowledge of these devices certainly informed its decision that the market among these device types is fluid. So the amicus brief presents these pictures as an example, but certainly FDA has knowledge of the products that are on the market. And again, these are only slightly bigger than a lighter. These are, again, easily hidden, and refilling them is also easy. If you go to the website of some of these devices that the amici point out in their brief, you can watch videos. You basically unscrew the top, squirt in the new liquid, screw the top back on, and you're set. So these are not complicated. These are not large, and these are not difficult to hide. Where do we find the pictures you were talking about? The amicus brief at page 11. This is the public health amicus brief. So, first, petitioners focus on the youth access plan. As an initial matter, Cloud9 really didn't have a youth access restriction plan, and there was some confusion about that in the briefs. But in fact, the record is before the court, and their youth access plan was a paragraph,  youth access restrictions. Our products were reaching the hands of youth. There were no specific measures that Cloud9 was going to take. Second, FDA reasonably determined that it didn't need to review these plans because it had experience with youth access restriction measures. How do you justify, even under the arbitrary capricious standard, in saying in the 2020 guidance, in the 2021 final rule, that these marketing programs are not only important, to the PMTA, but they are critical to the consideration of the PMTA? And then says, well, we didn't even read them. I mean, before you get to harmlessness, why isn't it arbitrary capricious to say that data is critical for you, the marketer, to put in the PMTA, but we're not going to read it? The youth access restriction plans are critical because they are a necessary part of the PMTA to show that the manufacturers are reducing as much as possible the risk that these products will end up in the hands of youth. But the plans are not sufficient in themselves. And yet the FDA, sorry to cut into you, but just to play devil's advocate, the footnote to the leaked technical report suggests exactly the opposite. Today, we have not found any marketing programs that would be sufficient to counter the danger to youth, but they acknowledge, the FDA acknowledged that theoretically it might be possible to have such a rigorous marketing restriction that youth will not be able to access these e-liquids. And so if it's theoretically possible, how can you say that it would not ever be sufficient? But FDA had not seen any youth access restriction measure in practice operating in a way that was sufficient to substantially reduce the risk to youth. And until FDA had seen that in practice, it was reasonable for FDA not to consider these plans. Even if the court does find, though, that there was any error in FDA not considering the youth access plans, any error was harmless. If you take a look at those plans, they include things, and this is Electric Cloud, because again, Cloud9 really didn't have a plan at all, but Electric Cloud basically said, we're gonna have age verification technology for online sales. In our shops, we're going to look at identification cards to verify age. We're not gonna put cartoon characters on the product, and we're not gonna use influencers that are particularly popular with youth. These types of restrictions, these are all the restrictions that FDA saw in response when in 2018 to 2019, it asked manufacturers to take efforts like these. These are the efforts that manufacturers took, and the FDA saw were inadequate. So any error in not considering petitioner's plans was harmless. The petitioners also argued that they didn't have notice of the substantive comparative efficacy standard that FDA applied. As an initial matter, the legal premise of petitioner's argument is incorrect. As the Supreme Court held in January 2, an agency can continue to interpret a statute and develop standards for adjudication in the course of the adjudications themselves. Furthermore, as the D.C. Circuit and the Ninth Circuit explained, the statute and the 2019 guidance gave adequate notice that petitioners should compare their products to tobacco-flavored products. The statute itself, this is in Section 387JB1, requires a manufacturer in its application to present evidence of comparative risk, comparing the risk of their product to others. Now, because petitioners are asserting that their product presents a benefit to existing smokers, the same benefit as that presented by tobacco-flavored products, it was only natural for them to compare their product to the tobacco-flavored e-cigarette products. Furthermore, in Section 387JC4, the statute requires FDA to examine, to consider the increased likelihood that existing smokers will stop smoking. Now, if tobacco-flavored e-cigarette products already present the same opportunity for existing smokers to quit or reduce their smoking, then introducing flavored tobacco products won't increase the likelihood that they quit. As this Fourth Circuit put it, nothing can increase or decrease in a vacuum, so this is necessarily a comparative efficacy standard. The 2019 guidance, furthermore, told manufacturers that they should compare their products to others within the same category and subcategory and other products in a different category. And again, because petitioners were arguing that their products present a benefit to existing smokers, the same benefit as that presented by tobacco-flavored products, that was a logical comparator. Petitioners actually knew that this was the comparison they needed to make. In their literature review that they presented to FDA, I believe it's on the second, maybe third page of the literature review, they asserted that flavored e-cigarette products are more effective in helping smokers quit than tobacco-flavored products. The problem was the evidence didn't back that up. And specifically, they didn't have any evidence that their products are more effective than tobacco-flavored products in helping smokers quit. So petitioners knew the standard, they simply failed to present the evidence to back up their assertions. The evidence that they did present were surveys of e-cigarette users, asking them what flavors they use. And most survey respondents said they used flavored e-cigarette products, not tobacco-flavored. And they asked them, do you use e-cigarettes to help you quit smoking? And many respondents said yes. But first of all, these surveys weren't asking about petitioner-specific products. Second, these were single-pointing time surveys, and so they weren't designed to measure behavior change over time. And third, and most importantly, they didn't seek to compare flavored e-cigarette products to tobacco-flavored products. So they didn't ask, for example, if, yes, you might use a flavored product, but if that flavored product weren't on the market, would you use a tobacco-flavored product instead of smoking? And the answer very well might be yes. Petitioners simply had no evidence showing that their flavored products, which present substantially greater risk to youth than tobacco-flavored products, provide a greater benefit compared to tobacco-flavored products. So unless the court has further questions, we ask that the court deny the petition for review. On the question of if this was remanded, what would they do differently? It sounded to me like your response is that they would do nothing differently because they had the opportunity to do so to file a new application. That's your response, right? And they still do. And they still do. Yes. Do you have any further response? Because there could be reasons for that. Why should they file a new application? Isn't that an acknowledgment that their first one is effective? And they don't want to do that because they're proceeding on these appeals. If they had studies showing that their products are more effective than tobacco-flavored products in helping smokers quit, presumably that would have been included in their original application. They could have amended it at any time before the denial order came out. How much time did they have between having notice and the final decision? So, again, petitioners had notice of this comparative efficacy standard from the statute from the 2019 guidance. Besides that, the lack of notice they're complaining about. You know what I mean. Yes. It was, I believe, a couple of months or at least a few weeks between the time when the first denial orders came out for flavored e-cigarette manufacturers before the denial order. Did the FDA get any EGADs filing saying, oh my gosh, you know, this is all new? They certainly didn't receive any amendments from petitioners. I'm not sure what they may have received from other manufacturers. If, again, you know, then this case was stayed for well over a year and petitioners could have filed and still can file a new application if they have the evidence necessary to meet the standard. When I asked the question about pictures, I was not just looking, I was not looking for pictures solely of the closed-in, of the open-ended systems. What I was looking for was a side-by-side of a cylinder system and an open-ended system. Is there a side-by-side in the record or do I have to put two pages together? I don't think there's one in the record. Is there a picture at all of a cylindrical or a closed-system device? Not that I'm aware of. FDA certainly knows about these devices. It's familiar with these devices. It has to approve these devices, not only the e-liquids, but the devices as well. So FDA certainly has the experience and I believe the court can take a look. One further question. Is there anything in the record, since there's no pictures, that gives me dimensions of a closed device or a cylindrical device? Because I have the dimensions of this smoke-gnored and soared. Yeah, not that I'm aware of. I don't believe that's in the record. All right, thank you. Okay, thank you. Thank you. The petitioner, I think,  so I'm going to give you 45 seconds for rebuttal. Okay, thank you, Your Honors. So with respect to just one important issue, counsel said that... Before you start, 45, please. Not three minutes, 10 seconds. Sure. I'm tough. It took us 50 seconds. Okay, now. Okay, so on the issue of whether... Counsel argued that in real numbers, a certain number of youth still are shown in these surveys to use the open tank systems. Okay, that's fine. That's also true of the VIEWS system, which is a tobacco-flavored, cartridge-based product by a large, big tobacco manufacturer that was approved by FDA. It's V-U-S-E. It is referenced in a footnote in one of the briefs, so you can find the information there. The information in that approval order shows that there are also a very large number of youth that use that product. Nonetheless, it was approved. So this goes back to the... Well, what's large? How does that... Is large more than 500,000? Well, I don't know if that approval packet gives real numbers, but it talks about the percentage of youth that use the VIEWS system, and it's not insignificant. I think it's something like 9% of surveyed youth or something like that. It's in the brief. There's a reference there. And this just goes back to... Whatever the number is, the FDA has to still weigh the evidence. It's still a smaller number than... With these cartridge and pod-based systems, they still have to weigh the evidence, benefits to adult smokers and cessation versus appeal to youth. Thank you, Your Honors. Thank you. Okay, this matter will be submitted. By the way, I thought it was... Both sides did an excellent job in your briefing and in your arguments.